Tom E. DIXSON and Diego Enterprises, Inc., Plaintiffs–Appellants,

v.

The UNITED STATES, Defendant–Appellee.

No. 97–5036.

United States Court of Appeals, Federal Circuit.

April 15, 1998.

Richard J. Webber, Arent Fox Kintner Plotkin & Kahn, Washington, DC, argued, for Plaintiffs–Appellants. On the brief were Mark Steven Kessler and Evangeline J. Larson, Kessler & Larson, San Diego, CA.

John C. Erickson, III, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, argued, for Defendant–Appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Kirk T. Manhardt, Assistant Director.

Before RICH, NEWMAN, Circuit Judges, and ARCHER, Senior Circuit Judge.

PAULINE NEWMAN, Circuit Judge.

Tom E. Dixson and Diego Enterprises (together "Dixson") appeal the decision of the United States Court of Federal Claims,[1] holding that Dixson did not perfect its with-

1. *Dixson v. United States*, No. 94–1094C (Fed.Cl. Oct. 1, 1996).

drawal of its bid and thus forfeited its earnest money and other sums. We reverse the judgment, and remand for repayment of the forfeited sums.

## BACKGROUND

The facts are not in dispute. The matter was decided on cross-motions for summary judgment.

By contract between Dixson and the Department of Housing and Urban Development (HUD), Dixson agreed to purchase the Escondido Retirement Service Center in Escondido, California, for $3,700,000 at a foreclosure sale. Dixson paid HUD $75,000 as an earnest money deposit and $357,050 in fees for several extensions of the closing date. The contract contained provisions for liquidated damages and risk of loss, as follows:

> 7. **Liquidated Damages.** Should Bidder fail or refuse to perform its obligations under this Acknowledgment for any reason ... the earnest money deposit and any extension fees, paid under section 8, shall be retained by ... HUD as liquidated damages.
>
> . . . .
>
> 9. **Risk of Loss and Rights of Rescision.** In the event of *any substantial damage to the Project prior to closing* by any cause (including, but not limited to fire, flood, earthquake, tornado and significant vandalism) other than willful acts or neglect of Bidder, HUD, in its sole discretion, may negotiate with the Bidder for a reduction in the sales price corresponding to the estimated amount of damages.... If HUD and the Bidder are unable to agree on the amount by which the purchase price should be reduced ... *Bidder may withdraw its bid, in which case HUD will ... return the earnest money deposit and any extension fee(s).*

(Emphases added.)

Before the closing, the property suffered severe rainwater and related damage. At the time there was disagreement as to the extent of the damage, as well as to the cost of repair. The parties attempted to negotiate a reduction in price, but were unsuccessful. Seven days before the scheduled closing, with no further extension available, Dixson wrote to HUD withdrawing the bid unless any of several proposed price reductions was accepted by HUD. The government refused to accept the withdrawal, stating that the damage was not "substantial" and thus that the withdrawal terms of Section 9 did not apply.

The Court of Federal Claims held that although the government now conceded that the damage was substantial, Dixson had not properly withdrawn its bid in the letter that it sent to HUD, and thus forfeited the deposit and fees. This appeal followed.

## DISCUSSION

■ The issue is the legal effect of the letter Dixson sent to HUD on March 24, 1993. The letter stated:

> We have met again with our contractor, John Porter, to assess the damage and necessary repairs to the project. Although we feel less concerned about water infiltrating the electrical systems, the more we examine the facility, the *more* concerned we are about damage that *can't* be seen and probable long term problems if extensive action is not taken now. Incidentally, weather reports now call for 1–2 inches of thundershowers the next few days.
>
> . . . .
>
> Since HUD is apparently unable to agree with our assessment of the damage, we offer alternatives that may resolve the issue. Since our concern is that we could have to absorb high costs for reoccurring repairs above which HUD is willing to pay, which would jeopardize our ability to have funds to set up and operate the facility, we propose that HUD help us assure adequate funds with the following proposals:
>
> 1. We would accept a $200,000 credit for damages if HUD carries a first mortgage on the project for $3,000,000 at 8% amortized over 30 years, with a balloon payment for the balance due in 5 years, assumable and with no prepayment penalty.

2. We would accept a $200,000 credit for damages if HUD carries a first mortgage on the project for $3,000,000 at 8% interest, all principal and interest payable in one year, assumable and with no prepayment penalty.

3. Return the deposit and extension fees and cancel the Agreement.

The letter also contained a detailed description of the damage and concluded with the following statement:

> Therefore, if HUD does not accept one of the proposals of this letter, we hereby withdraw our bid for the project in accordance with the Agreement.

Dixson argues that the letter constituted a withdrawal of its bid, as permitted by Section 9 of the agreement, when HUD did not accept any of the proposals in the letter. The government conceded in the Court of Federal Claims that the damage was "substantial." Nonetheless, the government argued that it is not required to return the deposit and fees because Dixson's letter was simply a negotiating document or offer to withdraw. The government states that a further letter was required if the bid were to be deemed withdrawn.

The Court of Federal Claims agreed, adopting the government's position that the March 24th letter was only "an offer to forbear from exercising their right to withdraw the bid in exchange for certain actions by HUD." The court held that HUD's rejection of the various proposed price reductions released Dixson from its offer to forbear from withdrawal, but did not result in a withdrawal.

We discern no equivocation in Dixson's letter of March 24th. The fact that the letter proposed terms which if accepted by the government would avoid the withdrawal, did not convert the statement of withdrawal ("we hereby withdraw our bid") into an ambiguous one. A conditioned withdrawal is not rendered equivocal by the clearly stated condition. Indeed, HUD understood that Dixson was invoking Section 9, for HUD's manager, Charles Wilson, rejected the withdrawal not because of any uncertainty or equivocation, but because he disputed the "substantiality" of the water damage:

> Your reliance on Section 9 of the contract is unfounded. As I repeatedly informed you, the water damage to the Project during January and February of this year was not "substantial."

Thus the government and Dixson had the same understanding of the withdrawal meaning of the March 24th letter. Their only disagreement at the time was whether the damage to the property was "substantial."

The Court of Federal Claims, holding that the March 24 letter did not satisfy Section 9, pointed to the continuation of negotiations during the week before the closing date, and HUD's rejection of all of the various proposals on March 26, as evidence that Dixson had not withdrawn its offer. However, the letter stated that "if HUD does not accept one of the proposals of this letter, we hereby withdraw our bid." This condition precedent was plainly met; the withdrawal was made when HUD rejected the proposals.

■ The government also argues that the rejection by HUD of Dixson's alternatives did not satisfy the expression "If HUD and the Bidder are unable to agree on the amount by which the purchase price should be reduced," stated in Section 9 as a condition which must be met before the bidder may withdraw its bid. We are directed to no grounds whatsoever for the position that although the parties were far apart, and all offers of both sides had been rejected, that agreement was reasonably viable. HUD had refused to extend the date for closing, then a week away. The parties' estimates of how much damage the rains had caused were half a million dollars apart, and the government would not then concede that the damage to the property was "substantial." The government conceded this for the first time before the Court of Federal Claims, apparently because of evidence adduced upon discovery. *See* Deposition of Charles Wilson at 19 ("I made the decisions about negotiating a credit exclusively. I had people [at HUD] question how I was going about it. As far as the

amount, I think I was out in left field by myself as far as the amount.").[2]

In accordance with Section 9 of the contract, Dixson had the right to withdraw its bid. It did so in a timely and effective manner. By the terms of the contract Dixson is entitled to the prompt return of its earnest money deposit and extension fees. The decision of the Court of Federal Claims is reversed, and the case is remanded for payment of the amount due, *viz.* the deposit and extension fees in total amount of $432,050 and interest in accordance with law.

Costs taxed in favor of Dixson.

*REVERSED and REMANDED.*

---

2. Charles Wilson testified by deposition that he had an estimate from the John Porter Construction Co. recommending a budget of $400,000, with an $80,000 contingency, to repair the damage to the property, when he offered Dixson a credit of $100,000 on March 22.